UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

**CRIMINAL ACTION NO. 25-46-DLB-CJS**

**UNITED STATES OF AMERICA**                                                                            **PLAINTIFF**

**VS.**                   **MEMORANDUM OPINION AND ORDER**

**KAMERON THOMAS**                                                                                 **DEFENDANT**

\* \* \* \* \* \* \* \* \* \*

**I.    INTRODUCTION**

This matter is before the Court upon Defendant Kameron Thomas's Motion to Suppress. (Doc. # 25). The United States filed its Response in Opposition (Doc. # 27), and Defendant did not file a Reply. The Court held an evidentiary hearing on September 24, 2025. Defendant was present for the hearing and was represented by Attorney Kerry L. Neff. The United States was represented by Assistant United States Attorney Andrew A. Spievack. At the conclusion of the hearing, the Court took the Motion under submission. For the following reasons, Defendant's Motion is **granted in part and denied in part**.

**II.    FINDINGS OF FACT**

Based on the parties' filings and the evidence produced at the suppression hearing, the Court makes the following factual findings.

On January 11, 2025, a detective in the Campbell County Police Department conducted a covert online investigation of the BitTorrent peer-to-peer network, which

1

uncovered an IP address used to download child sexual abuse materials ("CSAM"). The detective determined the IP address was located in the Covington, Kentucky area. The detective forwarded the information to Federal Bureau of Investigation ("FBI") Task Force Officer ("TFO") Austin Ross, who works in the FBI's Violent Crimes Against Children and Human Trafficking task force. TFO Ross obtained a subpoena for Charter Communications, which owned the IP address. The subpoena revealed that the IP address was linked with 513 Summer Point Drive in Walton, Kentucky ("the premises"), which TFO Ross determined was owned by Defendant Kameron Thomas.

TFO Ross subsequently sought a federal search warrant for the premises, which Magistrate Judge Smith issued. Around 8:30 a.m. on the morning of May 16, 2025, FBI agents and local law enforcement officers arrived to execute the search warrant.

Agents began the execution of the search warrant by announcing on a loudspeaker that residents of the premises should exit the home with their hands above their heads. Body-cam footage showed a number of officers in tactical equipment brandishing weapons, in what TFO Ross testified was standard FBI protocol for executing a search warrant. Shortly after using the loudspeaker, two men later identified as Ronald Knox and Kameron Thomas exited the premises and walked to the law enforcement vehicles. Knox and Thomas were handcuffed and asked to remain by law enforcement vehicles until the home was secured. A few minutes later, two more residents exited the premises and were also placed in handcuffs. Finally, after agents took additional measures to clear the residence, such as hitting an exterior window with a snow shovel and banging on closet doors inside the home, the final two residents exited the premises and were

2

subsequently handcuffed.  With the premises secured, agents entered the house to begin executing the search warrant.

While agents performed a protective sweep of the house, other law enforcement officers gathered information about the safety of the premises from the detained occupants.  In the midst of the officers' questioning, rain forced law enforcement to move the occupants into the premises' garage.  The occupants remained in handcuffs until agents concluded securing the residence several minutes later.

Once the premises were secured, TFO Ross approached a handcuffed Defendant, who he knew to be the homeowner, to explain to him why they were there.  TFO Ross told Defendant they were there as part of a CSAM investigation and asked if Defendant knew anything about the investigation.  Defendant responded that he did and that he had viewed CSAM.  TFO Ross then asked Defendant if he knew about the BitTorrent network.  Defendant replied that he did.

TFO Ross then took Defendant away from the garage where the other occupants were standing and brought him by his car on the street near the premises.  Upon reaching his car, TFO Ross removed the handcuffs.  TFO Ross thereafter told Defendant he was not under arrest and that he was free to leave, and asked if Defendant would nonetheless be willing to speak with him.  Defendant agreed.  TFO Ross then asked Defendant questions about the investigation, and Defendant gave incriminating statements.  TFO Ross testified that he conducted the interview on the street outside his parked vehicle, and the interview lasted approximately twenty minutes.  TFO Ross described the interview as a "casual conversation."

3

Defendant was arrested several hours after the initial execution of the search warrant on May 16, 2025. He was not interviewed a second time after being arrested. Defendant was formally indicted on June 12, 2025 on one count of accessing with intent to view visual depictions of minors engaging in sexually explicit conduct. (Doc. # 16). On August 14, 2025, Defendant filed the pending motion to suppress, in which he alleges that any statements he made were in violation of his constitutional rights. (Doc. # 25). That motion is now ripe for the Court's review.

### III.  ANALYSIS

Defendant's sole argument is that the statements he made to TFO Ross were made in violation of the Fifth, Sixth and Fourteenth Amendments under the United States Supreme Court's holding in *Miranda v. Arizona*. (*Id.* at 2). More specifically, Defendant maintains that he was subject to "questions elicit[ing] extremely incriminating information" without being advised of his *Miranda* rights prior to questioning. (*Id.*). The United States agrees that Defendant was not read his *Miranda* rights. (Doc. # 27 at 6). However, it contends that Defendant was not under arrest at the time he made the incriminating statements, thus eliminating any responsibility officers had to read him his *Miranda* rights. (*Id.*).

The Fifth Amendment provides, in pertinent part, that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In keeping with this right, the Supreme Court held in *Miranda v. Arizona* that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). The Court established a

set of four rights – commonly referred to as *Miranda* rights – that any individual taken into custody must be apprised of before law enforcement may start a custodial interrogation. *Id.* at 479.  Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).  Once law enforcement officers read those rights, an individual may "knowingly and intelligently" waive those rights by agreeing to answer questions from the officers or by making a statement to officers.  *Miranda*, 384 U.S. at 479.

Here, the parties agree that Defendant was not read his *Miranda* rights prior to answering any of TFO Ross's questions.  The parties differ on whether Defendant was in custody when he was subjected to TFO Ross's questions.

When determining whether a person is in custody for the purposes of *Miranda*, courts must look to "the objective circumstances of the interrogation" to determine "how a reasonable person in the position of the individual questioned would gauge the breadth of his or her freedom of action[.]"[1]  *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). To make that determination, the Sixth Circuit directs courts to consider four factors.  *United States v. Salvo*, 113 F.3d 943, 950 (6th Cir. 1998).  These factors are (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told

---

[1]  At the evidentiary hearing, counsel for the Defendant asked the Court to take note that the standard set by *Miranda* is custody or "the functional equivalent" of custody.  While the Court could not find that specific language in any binding precedent, the Court understands the reasonable person standard of his or her freedom of action as similar, if not equivalent, to Defendant's proposed functional equivalent standard.

5

that he or she did not need to answer the questions. *United States v. Levenderis*, 806 F.3d 390, 400 (6th Cir. 2015) (quoting *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)).

Based on the parties' filings and the evidence produced at the evidentiary hearing, the Court finds two encounters TFO Ross had with Defendant that could constitute a custodial interrogation. As such, the Court will address each encounter in turn.

### A. The brief questioning at the garage was a custodial interrogation.

After going through the four-step analysis, the Court concludes that the brief questioning which took place in the garage of the premises was a custodial interrogation. Accordingly, because Defendant was not read his *Miranda* rights, his statements from the garage encounter must be suppressed. At the time Defendant was questioned by TFO Ross in the garage, a reasonable person in Defendant's position would believe he was in custody. *Panak*, 552 F.3d at 465.

First, the location of the interview weighs in favor of a custodial interrogation. The encounter took place in the garage of the premises, which is attached to the home. Typically, questioning taking place at an individual's residence leans against a finding of a custodial interrogation. *Hinojosa*, 606 F.3d at 883; *see also Levenderis*, 806 F.3d at 400. However, even an encounter at an individual's home can turn custodial when an officer places handcuffs on or otherwise restrains the individual. *Panak*, 552 F.3d at 466. During this time, Defendant was handcuffed as part of the search warrant execution. (Doc. # 27). While the handcuffing may have been for the purpose of maintaining officer safety during the search, the fact remains that Defendant was handcuffed while

6

questioned. A reasonable person under the circumstances would likely believe themselves to be under arrest, even if they were not formally told as much.

Next, the length and manner of questioning weighs against a finding of custody. TFO Ross testified that he approached Defendant to explain who he was and why agents were executing the search warrant. TFO Ross then asked Defendant two questions about whether Defendant knew anything about the investigation and whether Defendant knew anything about the BitTorrent network, and Defendant answered both questions affirmatively. TFO Ross testified that he asked Defendant those questions as part of "explaining to [Defendant] what was occurring." Given the limited number of questions and the administrative purpose for which those questions were asked, this encounter served more as a means of letting the premises' owner know what was going on and why it was going on. TFO Ross asked Defendant the questions to let him know why his house was being raided, not to necessarily elicit incriminating information. As such, this factor weighs against a finding of a custodial interrogation.

The third factor, the restraint on the individual's freedom or movement, weighs in favor of a finding of custody. Defendant was in handcuffs while making the incriminating statements. (Doc. # 27 at 2). By handcuffing the Defendant, officers placed a restraint on his freedom of movement that would make a reasonable person think they were under arrest. *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999) (describing handcuffs as "items associated with force or coercion"). Additionally, Defendant and the other occupants were sequestered in a crowded area while officers finished securing the premises. In the Court's view, a reasonable person would think they were under arrest if

they were handcuffed in a crowded area while police held them in place. Accordingly, this factor weighs in favor of custody.

Finally, it is unclear whether Defendant was told he did not need to answer questions while in the garage. There is nothing in the record to indicate TFO Ross told Defendant he could leave or refuse to answer questions while in the garage. As such, this factor favors a finding of custody because there is no evidence that Defendant was told he could refuse the encounter while he was in the garage.

For these reasons, the Court finds that TFO Ross's brief questioning of Defendant while he was handcuffed in the garage constituted a custodial interrogation, such that Defendant should have been read his *Miranda* rights prior to questioning. Accordingly, any statements Defendant made in that limited, brief encounter should be suppressed.

**B. The interview by TFO Ross near his vehicle was not a custodial interrogation.**

Conversely, the Court finds that TFO Ross's second and more exhaustive questioning of Defendant was not a custodial interrogation. Defendant made incriminating statements to TFO Ross after having his handcuffs removed, being told he was not under arrest, and being told he was free to leave. A reasonable person, told they were not under arrest and that they were free to leave, would not think they were under arrest. *Levenderis*, 806 F.3d at 400.

First, the location of the interview weighs against a finding of custody. TFO Ross testified that he interviewed Defendant near his unmarked vehicle, which was parked on the street near the premises. Defendant was not inside TFO Ross's vehicle. Defendant was not surrounded by officers brandishing weapons. After the interview, Defendant was not arrested, placed in handcuffs, or put in the back of a police cruiser until hours later in

8

the day.  While it is true officers were executing the search warrant in the general vicinity of the interview, the Sixth Circuit has ruled that the mere execution of a warrant, standing alone, does not render an interview custodial.  *See Hinojosa*, 606 F.3d at 883 (holding that interviewing the Defendant at his home while the execution of an arrest warrant took place did not make the location a coercive environment); *see also United States v. Haque*, 315 Fed. App'x 510, 519 (6th Cir. 2009) (finding that a suspect who was interviewed near the home in the midst of an execution of a warrant was not in custody).  As such, the location of the questioning favors a finding of a non-custodial encounter.

The length and manner of the interview also favor a finding against custody.  In his Motion to Suppress, Defendant alleged that he was "interrogated by law enforcement officers for at least twenty-two minutes."  (Doc. # 25 at 2).  TFO Ross testified that he interviewed Defendant for approximately twenty minutes.  Questioning of this length falls well within the range of times the Sixth Circuit considers non-custodial.  See *United States v. Martinez*, 795 Fed.App'x 367, 374 (6th Cir. 2019) (deeming an eighty minute interview "not itself problematic" for *Miranda* custody analysis); *Mahan*, 190 F.3d at 422 (concluding an interview that lasted an hour and a half was not within a situation where a reasonable person would have thought they were in custody); *Levenderis*, 806 F.3d at 400 (finding a thirty minute interview to favor a non-custodial inquisition). TFO Ross described the interview as "more or less as a casual conversation," and said Defendant "[did not] seem intimidated or anything like that."  Encounters that are unintimidating have generally been found to be non-custodial.  *Panak*, 552 F.3d at 467 (concluding that the "non-threatening and cooperative nature" was indicative of a non-custodial interrogation).  Given the brief

9

and conversational manner of the questioning, the Court finds this factor supports a non-custodial encounter as well.

The strongest evidence that Defendant was not in custody is that TFO Ross placed no restraints on Defendant's freedom of movement. TFO Ross removed Defendant's handcuffs within moments of leading Defendant away from the garage. Courts have consistently found that a defendant who is not handcuffed is not in custody for *Miranda* purposes. *See Panak*, 552 F.3d at 467; *Hinojosa*, 606 F.3d at 883; *Martinez*, 765 Fed.App'x at 375. Most importantly, TFO Ross testified that he told Defendant that he was not under arrest several times. The record reflects that the occupants of the home, including Defendant, were told anywhere from six to twelve times that they were not under arrest. A reasonable person, hearing a message so many times, would believe that message to be true. *Martinez*, 795 Fed.App'x at 371. Additionally, there is no evidence in the record that officers were forcing Defendant to remain in place. In fact, TFO Ross testified he would not have stopped Defendant if Defendant chose to walk away from the interview. Considering all of this—the removal of handcuffs, the constant assurances that Defendant was not under arrest, and the absence of evidence that Defendant had to remain in place—the Court concludes a reasonable person in Defendant's situation would not believe themselves to be under arrest.

The final factor, whether Defendant was told he did not need to answer questions, also leans in favor of a finding against custody. TFO Ross admitted in his testimony that he did not explicitly tell Defendant that he did not have to answer his questions. Understanding this, the United States argues that by telling Defendant he was free to leave, TFO Ross signaled to Defendant that he did not have to answer questions. A

10

reasonable person, if told they could leave a questioning, would understand that to mean they do not have to take part in the interview. *See Luck*, 852 F.3d at 621 (finding that agents telling defendant he did not have to provide a statement and informing him he was free to leave enough to deem the encounter non-custodial). As with the first three, the fourth factor does not support a finding that Defendant was in police custody when he gave incriminating statements to TFO Ross.

For these reasons, the Court concludes the statements Defendant made to TFO Ross in the second interview were not obtained in violation of Defendant's Fifth Amendment rights under *Miranda*. Accordingly, the Court will not suppress those statements.

## IV. CONCLUSION

Based on the record, and considering the arguments presented and the authorities cited, the Court concludes, with the exception of the brief statements made by the Defendant while he was still handcuffed, the evidence and statements at issue were not obtained in violation of Defendant's constitutional rights. Accordingly,

**IT IS ORDERED** that Defendant Kameron Thomas's Motion to Suppress (Doc. # 25) is **granted in part** and **denied in part** as set forth herein.

**IT IS FURTHER ORDERED** that this matter is scheduled for a **Scheduling Conference** on **Thursday, October 16, 2025** at **1:00 p.m.** in **Covington**.

This 8th day of October, 2025.



Signed By:
David L. Bunning
Chief United States District Judge

11